UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-21372-Civ-LENARD
MAGISTRATE JUDGE P.A. WHITE

EUGENE HUNTER, JR.,                    :

    Petitioner,                    :    <u>SUPPLEMENTAL REPORT</u>
                                                  <u>OF</u>
v.                                     :    <u>MAGISTRATE JUDGE</u>
                                            <u>FOLLOWING EVIDENTIARY</u>
BILL McCOLLUM,                         :    <u>HEARING</u>

    Respondent.                    :

_____

I. <u>Introduction</u>

    Eugene Hunter, Jr., a convicted state felon, filed a <u>pro se</u> petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 in this Court, attacking the constitutionality of his convictions entered in Case No. 01-15270 in the Circuit Court of the Eleventh Judicial Circuit of Florida at Miami-Dade County. Counsel was subsequently appointed by this Court to represent Hunter, and he is now represented by the Federal Public Defender.

    This Cause has been re-referred to the undersigned for the purpose of conducting an evidentiary hearing and then consideration and supplemental report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts. <u>See</u> DE# 49.

    For its consideration of the issue on remand, the Court has various pleadings and supporting documentary exhibits filed by the parties after the order of remand as well as witness testimony presented at the evidentiary hearing and argument from counsel. (DE# 67, 69, 73, 75, 82, 84, 88, 90, 91, 92). The transcript of the evidentiary hearing conducted on March 25, 2010, can be found at

DE# 89.

## II. <u>Claim</u>

Hunter argues in claim three that his lawyers rendered ineffective assistance when they failed to file a motion to suppress the out-of-court identification made by the victim based upon the suggestiveness of the identification procedure and rendered ineffective assistance when they failed to cross-examine victim Germaine regarding the events leading to his identification of Hunter as the perpetrator. More specifically, Hunter complains that Germaine had been shown a single photograph of a person wearing a backpack before the formal photographic identification procedure took place. He further maintains that the victim's identification was unreliable, because the description of the perpetrator was often inconsistent and conflicting, and that the victim had been unable to identify Hunter as the perpetrator during the trial proceeding.

## III. <u>Facts and state court procedural history</u>[1]

Hunter was represented in the state trial court criminal proceeding by Special Assistant Public Defenders Paul Kaminsky and Nushin Sayfie. The victim of the armed robbery in this case is Lucien Germain, a Haitian immigrant. Germain had moved out of the State of Florida to the State of North Carolina after the subject robbery. On July 12, 2002, four days before the trial proceeding commenced, trial counsel Kaminsky conducted a deposition of Germain. <u>See</u> Transcript of Deposition of Lucien Germain. (DE# 27). Prosecutor Christopher Gahm was present for the deposition. <u>Id</u>. Germaine testified with the assistance of a Creole-speaking

---

[1]The full procedural history of this case need not be reviewed in the instant Report in that it has been thoroughly outlined in the earlier Report and Recommendation entered by the undersigned. <u>See</u> DE# 23. Accordingly, only those proceedings relevant to the re-referral will be set forth herein.

interpreter. <u>Id</u>. During trial counsel Kaminsky's questioning of Germain regarding his meeting with prosecutor Gahm immediately preceding the deposition, the following exchange took place between trial counsel and Germain:

> Q.   Did Mr. Gahm show you any pictures of anyone or anything?
>
> A.   Yes, I saw a few pictures.
>
> Q.   Describe to me the pictures that you saw.
>
> A.   *The same picture that I saw, the picture of the guy who rob me. He was wearing a backpack. He had a bag.*
>
> Q.   Did Mr. Gahm tell you that they were pictures the [sic] of the guy that robbed you?
>
> A.   No.

(emphasis added). <u>Id</u>. at 10. Again, before the conclusion of the deposition, Germain revealed the following regarding pictures of the robber:

> Q.   Did a police officer, at any time after the robbery, show you a picture of a gun?
>
> A.   I went to that office once and then they were showing me pictures and I saw a picture of that gun.
>
> Q.   Okay. What other pictures were shown to you?
>
> A.   What they showed me was a picture of the guy with a backpack.
>
> Q.   All right. Do you remember when that was that you saw a picture of a guy with a backpack?
>
> A.   Are you talking about today?
>
> Q.   No, a time other than today.
>
> A.   It was early morning once. I don't recall what day it was.
>
> Q.   How long after the robbery was it?

3

A.   At the most, two weeks after the robbery. I don't remember well.

Q.   Okay. Nobody showed you pictures before that?

A.   No.

Q.   Do you remember what the police officer said to you when he showed you the picture of the person with the backpack?

A.   I don't recall if he told me anything.

Q.   Okay. Did he - - do you recall if he said anything about the person in the picture?

A.   No.

Id. at 29-30.

Trial proceedings commenced on July 16, 2002, with *voir dire* proceedings. (DE# 69). The following day during opening statements, prosecutor Gahm referred to Germain's deposition and trial counsel Sayfie immediately objected. See Trial Transcript at 16-7. The prosecutor explained to the trial court at sidebar that "I anticipate fully the Defense is going to show a photograph of the backpack. *A person with a backpack was shown to the victim prior to the photo array. That's incorrect. According to [Germain], I talked to him after the deposition and that did not happen and so.*" Id. at 17. When the court inquired whether the victim had said in his deposition that a photograph of the backpack had been shown to him before the lineup, trial counsel Sayfie immediately responded that she did not anticipate asking the victim any such question. Id. Opening arguments then resumed.

During the evidentiary portion of the trial, the state called the following witnesses: (1) victim Lucien Germaine; (2) James Pierre, the owner of the convenience store and the victim's cousin; (3) Detective Juan Blanco, the arresting officer; (4) Detective

4

Robert Miller of the Miami-Dade County Police Department; (5) Jennifer McConaghy, a firearms and tool mark examiner; and (6) Detective Kumjian of the Miami-Dade County forensic video unit. Hunter did not testify in his own behalf and no defense witnesses were called. The defense at trial was one of misidentification. The testimony of the trial witnesses can be summarized as follows.

Germaine, who testified with the assistance of a Creole-speaking interpreter, testified that on **April 26, 2001**, he was working for his cousin as a cashier at the J.P. Quickmart, a convenience store, when a man entered the store with a dark-colored backpack. Because the cash register was open, Germain did not at that moment focus all his attention on the man and the man went behind one of the shelves. When Germain turned his head moments later, out of concern that the man was shoplifting, the man walked straight towards him holding a short-barreled shotgun. The man pointed the gun at Germain and told him to put his hands up, and to turn towards the wall, which he did. After the robber touched the victim's back pocket, the robber told Germaine to lie on the floor and he pushed him to the floor. The man then took approximately $400.00 in cash from the register and exited the store. All patrons of the store had exited the store while the robbery was in progress.

Once the robber left the store, Germain pushed an emergency button, and soon thereafter, Miami-Dade Police Officers Daniel Toledo and Jorge Arana arrived at the store. On **May 11, 2001**, fifteen-days after the robber, a photographic lineup was conducted during which Germaine selected Hunter's picture from the six-person photographic array and he positively identified Hunter as the man who had robbed him at gunpoint. Germaine testified that he saw the face of the person that robbed him three times during the robbery

and that the man was approximately 20-25 feet from him. He noticed that the man's face was round from about twenty feet away from him. The store was well lit with a light bulb right next to the cash register. Germaine described the robber as a black man around 5'8" or 5'9" who was "chunky" and had some facial hair. He recalled that the robber was wearing a short-sleeve white tee-shirt and a white hat. The robbery had been captured on videotape and the tape was played to the jury at trial. Germaine testified that he looked at the videotape after the robbery and again before trial and that it accurately showed what happened. He testified that the man in the videotape recording was the same man as he had identified in the photographic array. However, when asked if the robber was in the courtroom, the victim answered, "no." During cross-examination, Germaine was asked if he had described the robber as 5'6" after the robbery and he answered that he said the robber was a little bit taller than he is, which is 5'7". Trial counsel also asked Germain if he recalled telling the officer that the robber had been wearing a multicolored sweater, and Germain responded that he did not recall saying that and that the thief had been wearing a short sleeve white tee-shirt. When asked if he recalled telling the officer that the robber had been wearing a white hat, Germaine responded affirmatively. Pierre had purchased and maintained the video surveillance system for the store.

On **April 26, 2001**, Detective Robert Miller responded to the robbery at the JP Quick Mart. He arrived at approximately 9:30 P.M. and retrieved a video tape from Officer Toledo. Detective Miller assisted the officers at the scene and he viewed the videotape with Germaine at the store. The interview with Germain was conducted without a Creole-language interpreter. Detective Miller testified that he could not recall if they watched the video before or after obtaining a description from the victim. The victim described the

robber to Detective Miller as "chunky," and he said that the robber wore a white hat and had a full beard. On **April 30, 2001**, Detective Miller saw a flyer regarding Hunter's arrest and the flyer indicated similar characteristics he recalled from the instant robbery, such as, the use of a short-barreled shotgun and backpack. Detective Miller obtained a photographic lineup from Detective Hladky who had been involved with Hunter's unrelated case, and the lineup included Hunter's picture.

Detective Miller had not spoken to or seen the victim since the day of the robbery, until the day he showed him the lineup on **May 11, 2001**. Detective Miller testified that he had not told Germaine of Hunter's arrest, and had not told him that a shotgun had been found on Hunter's person when arrested. Detective Miller testified that he had not shown Germain any pictures after the robbery and before the photo identification procedure. Detective Miller showed the photo array to Germain at the store and he advised Germaine that the photo array may or may not contain a photo of the individual that robbed him. Within seconds of looking at the photos, the victim picked Hunter out of the line-up, stating with certainty that that was the man who robbed him. Detective Miller then obtained an arrest warrant. Detective Miller testified that Hunter was 5'10 and weighed 230 pounds at the time of the robbery and at the time of trial was approximately 175 pounds.

Detective Juan Blanco testified that on **April 30, 2001**, he arrested Hunter and found a sawed-off shotgun and a blue backpack on the floor of a vehicle between Hunter's legs. Detective Blanco testified that Hunter appeared to have lost fifty pounds from the time he arrested him to the time of trial and his hair was longer. Jennifer McConaghy, firearms and tool mark examiner for the Miami-Dade Police Department, testified that the .20 gauge

short-barreled shot gun in evidence was shortened after it was purchased. Detective Eric Kumjian testified that he was a trained senior forensic officer in the robbery unit of the Miami-Dade Police Department. Detective Kumjian attended the FBI academy through the law enforcement video association and is certified in forensic video analysis. Detective Kumjian was responsible for taking known images of items and comparing them to still images taken from the videotape recordings. Detective Kumjian testified that he compared pictures of himself wearing the backpack found on Hunter at the time of his arrest with pictures of the robber wearing the backpack.[2] He also compared pictures of the shotgun found on Hunter with a photograph of the shotgun seen on the surveillance tape. The detective testified at trial that there were numerous similarities. Detective Kumjian further testified that there were similarities between the backpack and the shotgun in the surveillance videotape and the backpack and the shotgun that Hunter possessed at the time of his arrest. There was no fingerprint evidence taken from the store to link Hunter to the robbery; only the gun. At trial, the victim was unable to identify Hunter in court as the perpetrator. The defense at trial was one of misidentification.

Hunter was convicted after the jury trial of armed robbery with a firearm, possession of a short-barreled shotgun, and carrying a concealed firearm. He was sentenced to a life term of imprisonment on the armed robbery conviction, a fifteen-year term on the possession of an illegal weapon conviction, and a five-year term on the carrying a concealed weapon conviction. The terms were imposed to run concurrently. The convictions and sentences were per curiam affirmed by the appellate court in a decision without

---

[2]See Respondent's Composite Exhibit 21, 22, 23 admitted at evidentiary hearing conducted in this case.

written opinion. Hunter v. State, 871 So.2d 887 (Fla. 3 DCA 2004)(table). Hunter pursued postconviction relief, raising the subject ineffective assistance of trial counsel claim in his initial pro se motion pursuant to Fla.R.Crim.P. 3.850. After reviewing the state's responses and the record in the case, the trial court summarily denied the motion and the denial of postconviction relief was affirmed in a decision without written opinion. Hunter v. State, 952 So.2d 1199 (Fla. 3 DCA 2007)(table).

## IV. Procedural History of §2254 Proceeding

Not long after all state court postconviction proceedings had concluded, Hunter came to this Court, instituting the instant federal habeas corpus pursuant to 28 U.S.C. §2254. In his response to the order to show cause, the respondent did not challenge the timeliness of the instant petition and also correctly conceded that ground three of the instant petition was properly exhausted and not subject to any procedural bar. A Report was  entered by the undersigned in which the subject claim was reviewed and found meritless. See Report of Magistrate Judge. (DE# 23). It was, therefore, recommended that the petition be denied. Id.

After the report had been entered, Hunter filed several motions to expand the record, which were granted. (DE# 26, 27, 34, 35, 39, 45). Hunter also filed an unsworn declaration stating that during his interrogation following his arrest, the detectives took pictures of him for use in the lineup, including one in which he was wearing a backpack. (DE# 32). He maintained that the victim was shown a picture of him wearing the backpack immediately before the photographic identification procedure was conducted in this case, thereby, tainting the victim's identification. Id. Due to Hunter's motions to expand the record, copies of the depositions of the victim and Officer Daniel Toledo were filed as were copies of

9

Officer Toledo and Detective Robert Miller's offense incident reports dated April 27 and 30, 2001. (DE# 26, 27, 34, 35, 39, 45). The record now contained for the first time a copy of the transcript of Germain's deposition which had been taken on July 12, 2002. (DE# 27).

Based upon the then-recently supplemented record, emphasizing the above-quoted deposition testimony of the victim, Hunter filed extensive objections to the undersigned's report. (DE# 31). After independent review of the record in its entirety and consideration of the objections, the Honorable Joan A. Lenard, United States District Judge, entered an order finding that an evidentiary hearing was necessary in this case "to further develop the record as to claim three."[3] See Order Remanding Petition To Magistrate Judge White For Evidentiary Hearing on Claim Three of the Petition at 7. (DE# 49). Specifically, Judge Lenard ruled that "further development of the record on the issue of the allegedly suggestive photo lineup is necessary to determine whether Petitioner's counsel was ineffective for failing to move to suppress Germaine's

---

[3]In finding that an evidentiary hearing was needed in this case, Judge Lenard relied heavily on Germain's deposition testimony. See Order Remanding Petition To Magistrate Judge White For Evidentiary Hearing on Claim Three of the Petition at 5, citing Transcript of Deposition of Germain at 10, 29-30. (DE# 49). Appointed counsel for the petitioner has asserted that Judge Lenard in her order found that the "picture of the guy with backpack" was in fact shown to Germain before he was shown the photo array. The undersigned disagrees with Petitioner's characterization of Judge Lenard's order. Rather, Judge Lenard's Order states that review of Germain's deposition testimony appears to indicate that he had been shown a picture of man wearing a backpack before he identified Hunter in the pretrial photographic lineup. Based upon the record then before Judge Lenard such a finding was reasonable and it was such a finding that resulted in the need for evidentiary proceedings to determine through testimony and additional records if the deposition testimony was accurate and, if so, whether trial counsel's performance was constitutionally ineffective based upon this new evidence. The full record now, after an extensive evidentiary hearing, clearly indicates that Germain was never shown a picture of Hunter wearing a backpack or Hunter with a backpack before the photo identification procedure, as fully discussed herein.

identification or to cross-examine Germaine regarding the events leading to his identification of Petitioner." <u>Id</u>. at 6-7. The Court specifically referred to and relied upon the above-quoted deposition testimony in its order. <u>Id</u>. at 5. Consequently, the instant habeas corpus petition was re-referred and remanded to the undersigned for an evidentiary hearing on claim three.

The Federal Public Defender was appointed by the undersigned to represent Hunter at all further stages of this Section 2254 proceeding, both before this Court and in any appellate proceedings. (DE# 51). After several continuances, an evidentiary hearing was conducted on March 25, 2010. (DE# 89). Counsel for the petitioner and respondent were permitted to filed post-hearing memoranda and they have now done so (DE# 90, 91, 92) and the case is ripe for disposition.

## V. <u>Evidentiary Hearing</u>[4]

At the evidentiary hearing conducted in this case, Hunter called two witnesses in his behalf: former trial counsel Paul Kaminsky and Officer Daniel Toledo. The respondent called the following witnesses: Detective William Hladky, Sergeant Eric Kumjian, and Detective Robert Miller. Numerous exhibits were admitted by the parties during the evidentiary hearing, which included several photographs of Hunter and a backpack; photograph of a shotgun; a photograph of Detective Kumjian wearing a backpack, police reports prepared by Officer Daniel Toledo and Detective Robert Miller; the photographic lineup in this case; Miami-Dade County intelligence flyer with Hunter's photograph; booking photographs of Hunter dated April 30, 2001; copy of a property receipt dated July 2, 2002; copies of images made from the

---

[4]The transcript of the evidentiary hearing conducted on March 25, 2010, can be found at DE# 89.

videotape recording of the robbery; copy of Officer Toledo's offense incident report; copies of transcripts of the depositions of Lucien Germain, Officer Toledo, Detective Robert Miller and Detective William Hladky; and a copy of the trial testimony of Germain. (DE# 88). The convenience store surveillance videotape recording was also admitted at the hearing and played in open court. (DE# 88, 89).

The pertinent testimony can be summarized as follows. The petitioner's first witness, Paul Kaminsky, was employed as an Assistant Public Defender since August 1995. On May 2, 2002, he was assigned as lead counsel to represent Hunter and he represented Hunter throughout the proceedings until his convictions. He testified that he had tried between six and ten armed robbery cases and that he had presented a mistaken identification defense two or three times before the instant case. The defense in this case was misidentification and trial counsel testified that the defense believed it would prevail at trial. Kaminsky testified that he had taken the deposition of Germain before trial. When asked whether there had been any difficulty with regard to questioning the victim during the deposition, trial counsel Kaminsky answered affirmatively, explaining that there had been a language issue.[5] Kaminsky was then asked: "Well, wasn't it true that even though [Germain] said [during his deposition] that he was shown a picture

---

[5]Specifically, Kaminsky testified:

The language problem. And [Germain] appeared - - he struck me as a very concrete sort of thinker and it was very difficult to get any sort of straight answer from him. It was my perception. And it was - - it was - - all depositions and testimony, in my experience, through interpreters, can be difficult at times. And this one was difficult.

(Transcript of Evidentiary Hearing conducted on March 25, 2009, at 41).  As indicated, Leucine Germaine is a Haitian immigrant who was not proficient in the English language and he testified during his deposition and at the time of the trial with the assistance of a Creole-speaking interpreter.

12

of a guy with a backpack, you did not take it to mean that he was shown a picture of Eugene Hunter wearing a backpack, correct?" See Transcript of Evidentiary Hearing conducted on March 25, 2009, at 41. Kaminsky answered: "Correct." Id.

Kaminsky testified that he had not filed a motion to suppress the out-of-court identification either before trial or after Germain's trial testimony. He did, however, file a motion to suppress in the case on other grounds, arguing that the stop of Hunter's vehicle which had led to his arrest had been unlawful and, therefore, all fruit of that poisonous tree should be suppressed (i.e., the backpack and the shotgun). Kaminsky testified that the state was attempting to connect Hunter to the instant robbery by way of the backpack and shotgun found in his car during the unrelated arrest, therefore, suppression of such items would have severely weakened the state's case. The motion to suppress was unsuccessful, however, and the damaging evidence was admitted at trial. Kaminsky testified he and co-counsel had been somewhat surprised by the failure of Germain to identify Hunter as the robber during the trial, but it was understandable since Hunter had lost a considerable amount of weight from the time of his arrest until the time of the trial. Kaminsky testified that by the time of the trial, Hunter looked nothing like the person in the photographic array and nothing like the person captured on the videotape recording. Trial counsel was asked whether from the time that he had commenced his representation of Hunter until the time that Hunter was convicted if Hunter had ever told counsel that he had been photographed wearing a backpack. Kaminsky answered in the negative. Kaminsky testified if he had been so told, he would have pursued that issue and would have, for example, filed a motion to compel the state to produce such a photograph. Kaminsky conceded that if he had filed a motion to suppress the out-of-court

identification and it had been successful, the case would have effectively been over. Kaminsky also testified that Hunter had never been interested in entering a guilty plea.

The petitioner next called Officer Toledo who testified that he was in the beginning of his training at the time of the subject robbery and he responded to the store with a training officer within minutes of the robbery. Officer Toledo testified that he interviewed the victim and completed an offense incident report. Officer Toledo, referring to his report, testified that the victim had described the robber as a black male, 18 to 21 years of age, approximately 5'6" inches in height, weighing 200 pounds, with a dark complexion, and heavy build. There was a notation regarding facial hair, but Officer Toledo was unable to read his own handwriting. The victim further described the robber as having worn a black skully, a multicolored sweater and dark pants. Officer Toledo testified that once Detective Miller arrived on the scene, the detective over the investigation. Officer Toledo testified that he had not talked to Detective Miller at the scene.

The respondent called as his first witness Detective William Hladky who is currently assigned to the homicide bureau. Detective Hladky was assigned to the robbery division when he met Hunter on April 30, 2001, after his arrest by detectives investigating cargo thefts. Detective Hladky testified that when Hunter was arrested, he was accompanied by another individual named Bodie and that Hunter possessed a shotgun, a knapsack and gloves. Detective Hladky testified that although Hunter refused to speak to him, he did take a picture of Hunter and also took a picture of the knapsack. See Respondent's Exhibit 18. Detective Hladky testified that the photograph taken of Hunter did not include Hunter wearing a backpack. Detective Hladky further testified that he had never

14

photographed Hunter wearing a backpack, that the picture of Hunter
and the backpack had not been taken at the same time, and Hunter
and the backpack were never in the same room at the same time.
Detective Hladky testified that he took the photograph of Hunter
and placed it in a photographic lineup to use in his investigation
of a robbery not related to the instant armed robbery. He testified
that he also used the photograph to prepare an intelligence flier
for the purpose of communicating to other local law enforcement
agencies information about the suspect and that he had been
arrested in possession of a loaded sawed-off shotgun and a
knapsack. See Respondent's Exhibit 13.

Detective Hladky testified that he had not been aware of the
subject armed robbery case and only became aware of the case when
Detective Miller approached him, holding the flier, and stated that
he had a case in which Hunter may have been involved. Detective
Miller then asked Detective Hladky whether a photographic lineup
had been prepared, using Hunter's photograph, and Detective Hladky
then provided Detective Miller with the lineup he had complied a
few days before. See Respondent's Exhibit 2. Detective Hladky
testified that he never met the victim in the subject convenience
store robbery and that he had never showed the victim any
photographs of Hunter. Detective Hladky testified that, other than
providing Detective Miller with the photographic lineup, he had no
involvement whatever in the subject robbery case. He also testified
that he never saw a picture of Hunter wearing a backpack, he was
not aware of any photograph of Hunter wearing a backpack, and the
picture he took of Hunter did not include Hunter's full body.

The respondent's next witness was Sergeant Eric Kumjian who
had been an officer with the Miami-Dade Police Department for more
than twenty-five years and had been a forensic video analyst at the

15

time of the subject crime. Sergeant Kumjian testified that
Detective Miller had asked him to enhance a videotape recording and
capture images from that videotape recording in an armed robbery
case. Sergeant Kumjian testified that he had a picture taken of him
carrying a backpack on his left shoulder. See Respondent's Exhibit
3. Sergeant Kumjian testified that he had received the backpack
from Detective Miller some time after July 2, 2002, and that the
picture of him with the backpack had been taken so that he could
compare the picture with the images from the videotape recording of
the robbery which he had viewed.

The respondent's final witness was Detective Miller, a twenty-
year officer with the Miami-Dade Police Department who is currently
assigned to the homicide division. Detective Miller testified that
he was assigned an armed robbery that occurred at the JP Quick
Mart. Detective Miller testified that upon arriving at the store,
he spoke with Officer Toledo, obtained a copy of Officer Toledo's
report and ultimately interviewed the victim who described the
armed robbery. Detective Miller testified that he also viewed the
videotape of the robbery with the victim the same day as the
robbery. Detective Miller testified that Germain had told him that
he had enough time during the incident to view the robber's face
and that he could make a positive identification. Detective Miller
testified that the description of the robbery provided by Germaine
was consistent with what he had viewed on the videotape and that
the robber had crossed in front of Germain. Detective Miller
testified that on May 10, 2001, he saw posted in the robbery bureau
an intelligence flier that had been created by Detective Hladky and
the flier indicated that Hunter had possessed a loaded sawed-off
shotgun and knapsack when arrested on April 30, 2001. See
Respondent's Exhibit 13. Only after seeing the flyer did Detective
Miller meet with Detective Hladky to discuss the instant case.

16

Detective Miller testified that he asked Detective Hladky if he had prepared a lineup which included Hunter's photograph and Detective Hladky indicated that he had and then provided Detective Miller with the lineup. When asked if Detective Hladky had also given him any photographs of Hunter wearing a backpack, Detective Miller unequivocally responded in the negative.

Regarding the photographic lineup, Detective Miller testified as follows:

> Q.   Now, when you received the lineup from Detective Hladky, what did you do with the lineup?
>
> A.   I telephoned Mr. Germaine, advising him that I needed to meet with him to show him a photo array.
>
> Q.   Do you remember when this was?
>
> A.   I believe it was on May 11.
>
> Q.   And where did this occur?
>
> A.   The presentation of the photo array was done at the establishment.
>
> Q.   Beside the picture of the photo array, did you have any other pictures in your possession?
>
> A.   Other than the pictures that were provided me by Detective Hladky, which included the masks and gloves, a shotgun and some shotgun shells.
>
> Q.   Did you have any photographs of [Hunter] in your possession besides the photo that was in the lineup?
>
> A.   No, I did not. Or -- other than what's on the flier.
>
> Q.   Was anybody else present when you were showing the lineup to Mr. Germaine?
>
> A.   No.
>
> Q.   Did you or anyone else suggest to Mr. Germaine who to select from the lineup?
>
> A.   None whatsoever.

17

Q.    Did you show Mr. Germaine any pictures before showing him the lineup?

A.    No, I did not.

Q.    Did you show -- and that includes any pictures of [Hunter], in any manner, before showing him the lineup?

A.    I showed no pictures to Mr. Germaine prior to showing the photographic lineup.

See Transcript of Evidentiary Hearing conducted on March 25, 2009, at 119-20.

Detective Miller next described the lineup procedure in this case and what he had explained to Germaine before showing him the photographic array. Detective Miller testified that he indicated that the person or persons contained in the lineup may or may not be the person or persons responsible for committing the robbery. Detective Miller testified that he then asked Germain to  look at each photograph, and to see if he recognized anyone. Detective Miller testified that Germain appeared to understand the instructions and withing five to ten seconds, he selected Hunter's photograph from the lineup. Detective Miller testified that Germain pointed to Hunter's photograph and unequivocally said, "this is the man who robbed me." Detective Hunter testified that there appeared to be no doubt in Germain's mind that Hunter had been the armed robber and he had not selected any other photograph from the lineup. Pursuant to Detective Miller's instructions, Germain validated his positive identification by printing, signing and dating the photographic lineup below the picture of Hunter. Detective Miller was asked if after the lineup procedure whether he had shown Germain a photograph of Hunter with a backpack, and the detective answered in the negative. Detective Miller testified that although he was able to recognize Hunter at the time of the trial,

Hunter's appearance had changed since his arrest in that he had lost approximately fifty to sixty pounds, his hair was cut, and he was wearing glasses at the time, in trial. Detective Miller acknowledged that he was aware of still photographs depicting Hunter wearing a backpack that had been captured from the videotape recording that had been prepared by Detective Kumjian and he testified that the still photographs accurately reflected the videotape recording. See Petitioner's Exhibit 3; Respondent's Composite Exhibits 21, 22, 23.

During cross-examination, the petitioner referred to Officer Toledo's report, pointing out that Germain had described the robber as an African-American male between the ages of 18 to 21 who was 5'6" in height, weighed 200 pounds, had a full beard, and had a dark complexion. See Petitioner's Exhibit 6. Detective Miller testified during cross-examination that Germain had also provided him with a description of the robber, stating that the robber was a black male, 5'9" to 5'10" in height, weighed 180 to 200 pounds, was chunky, had black hair, and a full beard. Germain had also said that the robber had been wearing a white Tee-shirt, jeans, a white hat, and carried a dark-colored duffel bag. Detective Miller admitted that in videotape recording, the robber had not been wearing a white hat and that the height description provided by Germain to Officer Toledo differed from the one he received from Germain. Detective Miller further testified that he had received photographs from Detective Hladky consisting of the shotgun, mask, and shells. He testified that he did not have any contact whatever with the backpack or shotgun until July of 2002, and therefore did not have access to the backpack and could not have given the backpack to either Detectives Kumjian or Hladky or anyone else to take photographs with it before July of 2002. Detective Miller testified further on cross-examination that he believed that he

showed Germaine one other photograph the same day as the photographic lineup but after the presentation of the photo lineup. On redirect examination, Detective Miller testified that he had never shown Germain Petitioner's Exhibits 2 and 13 to the victim before the lineup.

### VI. <u>Standard of Review</u>

Petitioner filed his petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996). Post-AEDPA law, therefore, governs this action. <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 127 S.Ct. 1654, 1664, 167 L.Ed.2d 585 (2007); <u>Penry v. Johnson</u>, 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); <u>Davis v. Jones</u>, 506 F.3d 1325, 1331, n .9 (11 Cir. 2007). It is important to recognize just how limited is this Court's review in a habeas proceeding. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L .No. 104-132, 110 Stat. 1214 (1996), provides that a federal court may not grant the writ unless the state court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

As the United States Supreme Court explained in <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court

has on a set of materially indistinguishable facts. Under the
"unreasonable application" clause, a federal habeas court may
grant the writ if the state court identifies the correct
governing legal principle from this Court's decisions but
unreasonably applies that principle to the facts of the
prisoner's case.

In deciding whether a state court ruling involved an "unreasonable
application" of federal law, this Court does not focus merely upon
whether the state court decision was erroneous or incorrect;
rather, this Court may issue a writ of habeas corpus only if the
state court's application of clearly-established federal law was
objectively unreasonable. *See id*. at 409-11. <u>See also</u> <u>Knowles v.</u>
<u>Mirzayance</u>, ___ U.S. ___, 129 S.Ct. 1411, 1418 (2009).

The statutory phrase "clearly established Federal law" "refers
to the holdings, as opposed to the dicta, of [the U.S. Supreme]
Court's decisions as of the time of the relevant state-court
decision." <u>Williams v. Taylor</u>, 529 U.S. at 412, 120 S.Ct. at 1523
(majority opinion by O'Connor, J.). Even where a state court denies
an application for post-conviction relief without written opinion,
that decision constitutes an "adjudication on the merits," and is
thus entitled to the same deference as if the state court had
entered written findings to support its decision. <u>See</u> <u>Wright v.</u>
<u>Sec. of Dep't of Corr</u>., 278 F.3d 1245, 1255 (11 Cir. 2002).
Further, findings of fact by the state court are presumed correct,
and the petitioner bears the burden of rebutting that presumption
of correctness by clear and convincing evidence. <u>See</u> 28 U.S.C.
§2254(e)(1); <u>Crowe v. Hall</u>, 490 F.3d 840, 844 (11 Cir. 2007), *cert.*
*denied*, ___ U.S. ___, 128 S.Ct. 2053 (2008).

VII. <u>Discussion</u>

Hunter claims that his lawyers rendered ineffective assistance
when they failed to file a motion to suppress the out-of-court
identification made by the victim based upon the suggestiveness of

21

the identification procedure and they rendered ineffective assistance when they failed to cross-examine victim Germaine regarding the events leading to his identification of Hunter as the perpetrator. More specifically, Hunter complained before the evidentiary hearing was conducted in this case that Germaine had been shown a single photograph of a person *wearing* a backpack before the formal photographic identification procedure took place. Now, it appears, Hunter is claiming that Germain was shown a picture of a person *with* a backpack before viewing the photo array and that the photographic array itself was suggestive. Hunter further maintains that the victim's identification was unreliable, because the description of the perpetrator was often inconsistent and conflicting and the victim had been unable to identify Hunter as the perpetrator during the trial proceeding.

## (A) Procedural Defenses

Before getting to the merits of the claim of ineffective assistance of trial counsel, the respondent's procedural defenses must be addressed. The respondent argues that the claim or subclaims as presented by the petitioner are unexhausted and prospectively procedurally barred from federal habeas corpus review, because they are based upon new factual allegations than was presented to the state courts.[6] Even if some or part of the claim presented here is technically unexhausted, since the subject ineffective assistance of trial counsel claim and all its subclaims are intertwined and are all meritless, it will best serve the

---

[6]When a federal habeas petitioner raises a claim previously presented in the state courts, but bases the federal habeas corpus claim upon new factual allegations, new legal theories, or materially different and stronger evidence than was presented to the state courts, then the claim has not been fairly presented in the state courts and the petitioner has failed to exhaust his state remedies in accordance with 28 U.S.C. §2254(b) and (c). See Jones v. Campbell, 436 F.3d 1285, 1299 (11 Cir. 2006)("Because Jones did not raise this specific claim of ineffective assistance of counsel in state court, the claim is [unexhausted and] procedurally barred").

interest of judicial economy not to further belabor the exhaustion and related procedural bar issues and to exercise the discretion now afforded by Section 2254, as amended by the AEDPA, which permits a federal court to deny on the merits a habeas corpus application containing unexhausted claims. <u>See</u> 28 U.S.C. §2254(b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").[7] Consequently, review on the merits will not be denied.

### (B) <u>Applicable Established Law</u>

#### (1) <u>Sixth Amendment</u>

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel. U.S. Const. Amend. VI. In order to prevail in this habeas corpus proceeding on his claim of ineffective assistance of counsel, the petitioner must make a particularized showing of an identifiable lapse in counsel's performance which falls below constitutional standards, and the petitioner must establish that the error was prejudicial, that is, but for counsel's error, there is a reasonable probability that the ultimate result would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. <u>Id</u>. The court need not address both prongs of the *Strickland* standard if the complainant has made

---

[7]It is further noted that although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated. <u>See</u> <u>Lambrix v. Singletary</u>, 520 U.S. 518 (1997). <u>See also</u> <u>Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8 Cir. 1999)(stating that judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner and the procedural bar issues are complicated), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999); <u>Chambers v. Bowersox</u>, 157 F.3d 560, 564 n. 4 (8 Cir. 1998)(stating that "[t]he simplest way to decide a case is often the best.").

an insufficient showing on one. Id. at 697. See also Brown v. Head, 272 F.3d 1308, 1313 (11 Cir. 2001), cert. denied, 537 U.S. 978 (2002).

To show counsel's performance was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take or, in this case, did not take. Grayson v. Thompson, 257 F.3d 1194, 1216 (11 Cir. 2001). A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689-90. Further, a court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000)(quoting Strickland, 466 U.S. at 690). "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' ... and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 125 S.Ct. 2456, 2462 (2005)(citations omitted).

To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See Knowles v. Mirzayance, _____ U.S. ____, ____, 129 S.Ct. 1411, 1422, 173 L.Ed.2d 251 (2009)("To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.")(internal quotation marks and citation omitted). It is well settled that counsel has no duty to raise issues which have little or no chance of success. See Knowles, 129 S.Ct. at 1420-22 (stating that Court has never required defense counsel to pursue every claim or

defense, regardless of its merit, viability, or realistic chance for success). <u>See also</u> <u>Chandler v. Moore</u>, 240 F.3d 907, 917 (11 Cir. 2001)(counsel is not ineffective for failing to raise a non-meritorious objection); <u>Card v. Dugger</u>, 911 F.2d 1494, 1520 (11 Cir. 1990)(holding that appellate counsel is not required to raise meritless issues).

### (2) <u>Out-of-court Identifications</u>

A defendant possesses a due process right to exclude identification testimony resulting from an unnecessarily suggestive identification procedure conducive to irreparable misidentification. <u>Stovall v. Denno</u>, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 1972, 18 L.Ed2d 1199 (1967). A conviction based on eyewitness identification following a pretrial identification is invalid if the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. <u>Simmons v. United States</u>, 390 U.S. 377 (1968). When determining the admissibility of eyewitness testimony, the primary evil to be avoided is a very substantial likelihood of misidentification. "It is the likelihood of misidentification which violates a defendant's right to due process...." <u>Neil v. Biggers</u>, 409 U.S. 188, 198, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972) (1972).

Where pretrial identification is by photograph, the court uses a two part test to determine whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. <u>Simmons</u>, <u>supra</u>. First, the court questions whether the identification procedure itself was unduly suggestive. The crucial test of suggestiveness is whether the line-up suggests which individual the witness should identify, thereby creating a likelihood of misidentification. <u>Neil v. Biggers</u>, 409 U.S. at 198.

If suggestive, the court then determines whether the identification was still reliable under the totality of the circumstances. <u>Neil v. Biggers</u>, 409 U.S. at 199. <u>See also</u> <u>Manson v. Braithwaite</u>, 432 U.S. 98 (1977); <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1508 (11 Cir. 1991); <u>Cikora v. Dugger</u>, 840 F.2d 893 (11 Cir. 1988); <u>Dobbs v. Kemp</u>, 790 F.2d 1499, 1506 (11 Cir. 1986); <u>Grant v. State</u>, 390 So.2d 341, 343 (Fla.), <u>cert.</u> <u>denied</u>, 451 U.S. 913 (1981). Generally, five factors are considered when determining whether the identification was reliable including (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the suspect, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. <u>Neil</u>, 388 U.S. at 199-200; <u>Grant</u>, 390 So.2d at 343. <u>See also</u> <u>O'Brien v. Wainwright</u>, 738 F.2d 1139, 1141 (11 Cir. 1988).

### (C) Ineffectiveness Regarding Motion to Suppress Identification Evidence Based Upon Photograph of Hunter Wearing or With Backpack

Hunter's claim that trial counsel's performance was constitutionally ineffective for failing to file a motion to suppress on the basis that the identification procedure had been rendered unlawfully suggestive on the basis that victim Germaine had been shown a single photograph of a person wearing a backpack before the formal photographic identification procedure took place is meritless. There is no evidence whatever in the record, other than Hunter's self-serving declarations, that any such photograph existed, let alone that it was shown to the victim at any time before the trial.

Detective Hladky testified at the evidentiary hearing that he had never photographed Hunter wearing a backpack. Detective Miller

26

testified that he had not received any photographs of Hunter wearing a backpack. And, former trial counsel Kaminsky testified that from the time that he had commenced his representation of Hunter until the time that Hunter was convicted, Hunter never advised counsel that he had been photographed wearing a backpack. Kaminsky testified if Hunter had told him that, he would have pursued that issue and would have, for example, filed a motion to compel the state to produce such a photograph. This Court finds the testimony of Detectives Hladky and Miller and of trial counsel Kaminsky credible and rejects Hunter's assertion otherwise as incredible. Accordingly, trial counsel cannot be deemed to have provided constitutionally ineffective representation for failing to file a motion to suppress on this basis. There is no duty to raise issues which have little or no chance of success. See Knowles, 129 S.Ct. at 1420-22 (stating that Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success). See also Chandler v. Moore, 240 F.3d 907, 917 (11 Cir. 2001)(counsel is not ineffective for failing to raise a non-meritorious objection); Card v. Dugger, 911 F.2d 1494, 1520 (11 Cir. 1990)(holding that appellate counsel is not required to raise meritless issues).

Hunter more-recently claims that he received ineffective assistance of trial counsel based on the allegation that before the photographic lineup, Germaine was shown a photograph of a "guy with backpack" which consisted of a single sheet displaying two Polaroid photographs, one photograph of Hunter and one photograph of a backpack. See e.g., Petitioner's Exhibit 2 admitted at evidentiary hearing. This claim too is without merit, as contradicted by the record. No photographs were shown to Germaine before the photo lineup. The testimony of the witnesses at the evidentiary hearing revealed that Detective Miller was the only officer present during

the photographic lineup and he conducted the lineup. Detective Miller unequivocally testified at the hearing that he had not shown Germain any photographs *before* the photo lineup, and he similarly testified during his pretrial deposition and the trial proceeding. See Trial Transcript at 134-135, 137; Transcript of Deposition of Robert Miller at 24-5. Detective Miller was adamant that he never showed him any photograph of Hunter wearing a backpack or a picture of him above a picture of a backpack and the officer did not have the backpack in his possession at the time of the photographic lineup. Moreover, Detective Hladky testified that never met Germaine and he never showed Germain any photographs of Hunter. Sergeant Kumjian similarly testified that he never met Germaine and he did not show him any photographs of Hunter. This Court finds the testimony of these witnesses on this issue credible.[8] Although there were certainly still photographs depicting Hunter wearing a backpack that had been captured from the videotape recording that had been prepared by Detective Kumjian, as Detective Miller testified during the evidentiary hearing, no such photographs were shown to the victim before the subject identification procedure.

As opposed to when the initial Report was entered, it is now clear from Detective Kumjian's testimony at the evidentiary hearing, that the photographs of him wearing the backpack were taken after July 2, 2002, well-after the photographic identification procedure had taken place. Thus, based on the full record before this Court, which includes testimony from the

---

[8]Petitioner attempts to discredit Detective Miller's testimony, pointing out that the detective attempted to distance himself from the photographs in Petitioner's Exhibit 2. See Petitioner's Posthearing Memorandum at 8-9. Even if any of Miller's testimony with regard to how he obtained the subject photographs and from whom could be viewed as inconsistent, the undersigned finds that any such inconsistencies do not warrant a finding that Detective Miller is an untruthful witness and/or render his testimony on the material issue before this Court, whether the other photographs were shown to the victim before the lineup, incredible.

witnesses at the evidentiary hearing in this case, which testimony has been found credible, the claim that the identification procedure conducted in this case was tainted and/or suggestive is not supported by the record. While the victim's testimony during the deposition may appear to indicate that he was shown photographs at some time after the incident, and such timing appears to coincide with the timing of the photographic lineup, the testimony now before this Court indicates that, if the victim was shown any photographs other than the photographic lineup, such as a picture of the shotgun, it happened after the lineup, not before. See e.g., Transcript of Deposition of Robert Miller conducted on June 19, 2002, at 20.

Further, based upon the record before this Court, which includes former trial counsel's testimony, the victim here was certainly not fluent in the English language.[9] When he was asked during his deposition if he had ever seen any pictures of anyone or anything, Germain answered that he had seen a few pictures. When asked to describe those pictures, he responded, "The same picture that I saw, the picture of the guy who rob me. He was wearing a backpack. He had a bag." See Transcript of Deposition of Germain at 10. He also testified during his deposition that he saw a "picture of the guy with backpack" Id. at 29. It is undisputed that Germain had viewed the videotape recording of the robbery with Detective Miller at the store the day of the robbery and it is undisputed that the robber was seen wearing a backpack in the videotape recording. See Petitioner's Exhibit 3; Respondent's Composite Ex. 21. Germain also testified during his deposition that he had seen pictures of the robber with a backpack before he was deposed by

---

[9]For example, Germain was asked during his deposition whether he had been able to communicate with the non-Creole speaking officers, and he responded: "I communicated with them the best way I could. Not that well." See Transcript of deposition of Germain at 23.

trial counsel.

While Germain's deposition testimony in and of itself may be unclear, resulting in the need for evidentiary proceedings in this case, the testimony and evidence admitted at the evidentiary hearing now clearly shows that Germain was not shown any pictures of Hunter before the photographic lineup procedure. This conclusion is further supported by the statements made by prosecutor Gahm to the court at the start of the trial proceeding during a sidebar conference, as quoted above. The prosecutor apparently recognized the ambiguity created by Germain's deposition testimony with regard to what Germain had seen, if anything, before the photographic lineup and he advised the trial court that he had spoken to Germain after the deposition to clarify Germain's ambiguous testimony. During that discussion, Germain told him that he was not shown a picture of a person with a backpack before the photographic array. This Court recognizes that prosecutor Gahm's statements were not made under oath and, even if they had been, they constitute hearsay. However, the prosecutor's statements were made when he was addressing the court. The prosecutor, with heightened duties, was obligated as an officer of the court and member of The Florida Bar not to mislead the court. See R.Regulating Fla. Bar 4-3.3(a)(1), entitled "Candor Toward The Tribunal" (providing that a lawyer shall not "knowingly make a false statement of fact or law to a tribunal"); 4-3.8, entitled "Special responsibilities of a prosecutor."

The record also indicates that trial counsel actively investigated the instant case, taking various pretrial depositions of those involved in the subject criminal proceeding other than Germain and he had obtained various photographs and reports prepared by the various officers which were referred to during the

depositions. Specifically, trial counsel Kaminsky deposed Officer Jorge Arana on June 11, 2002; Officer Daniel Toledo on June 13, 2002; Detective Robert Miller on June 19, 2002; Officer William Hladky on July 9, 2002; Officer Daniel Toledo. (DE# 38, 69-3, 69-4, 69-5). No evidence then indicated that any photographs of Hunter with or without a backpack were shown to Germain before the photographic lineup. See e.g., Transcript of Deposition of Detective Miller at 21, 25. Accordingly, up until the time of Germain's deposition there was no basis upon which to pursue a motion to suppress the identification procedure on the ground that it had been tainted by photographs of Hunter with a backpack. Even if this Court were to find that trial counsel's performance was constitutionally ineffective for failing to pursue the issue of the identification procedure based upon Germain's deposition testimony and then file a pretrial motion to suppress the identification evidence or make such a motion at trial, Hunter was not prejudiced by trial counsel's failure to do so in that any such motion ultimately would have been denied. The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 129 S.Ct. at 1420. Moreover, as indicated immediately below, the identification was reliable.

### (D) Ineffectiveness Regarding Motion to Suppress Identification Evidence Based Upon Suggestive Photo Array

Hunter next claims that the photographic array itself was unduly suggestive, because (1) Hunter's photograph contained certain features that distinguished it from others in the array; (2) Hunter was wearing clothing that matched the description of clothing worn by the perpetrator; and (3) the array was also unduly suggestive because Hunter's photograph was not an accurate depiction of his appearance at the time. This claim is also

31

meritless.

The record reveals that on April 30, 2001, after Hunter had been arrested on the unrelated criminal charges, Detective Hladky as a matter of police procedure took a Polaroid picture of Hunter. See Transcript of Evidentiary Hearing at 84; Respondent's Exhibit 18. Detective Hladky then included that photograph in a photographic lineup. See Transcript of Evidentiary Hearing at 84, 85, 88; Respondent's Ex. 18; Petitioner's Exhibit 1. At the time that he compiled the photographic lineup, Detective Hladky had no knowledge about the subject armed robbery, no knowledge of Germaine's description of the perpetrator, and he had not seen the videotape recording of the robbery. See Transcript of Evidentiary Hearing at 87, 94-5. He had not even met Germaine. Id. at 89. The photographic lineup was not created for the instant case but, instead, created in connection with an unrelated robbery and unrelated suspect. Id. at 92-3, 98. Detective Hladky testified at the evidentiary hearing that he had created photographic lineups for the past fifteen years and he took care to ensure that no one person in the lineup stands out to avoid any suggestiveness. Id. at 88-9. Thus, the lineup was not created to conform with Germaine's description and Detective Hladky had no motive whatever to attempt to suggest to victim Germaine who to select as the perpetrator of the instant case.

Reviewing the evidence and applicable law, the undersigned disagrees with Petitioner that the photographic array used here was improper or unduly suggestive. A photographic line-up is unduly suggestive when a suspect's photograph significantly stands out from the rest of the photos in the array. O'Brien v. Wainwright, 738 F.2d 1139, 1141 (11 Cir. 1988). The photographic line-up used

32

by Detective Miller consists of six photographs of African-American males of approximately the same age, similar facial gesture, and similar hairstyle. See Petitioner's Exhibit 1; Respondent's Exhibit 2. Detective Miller  simply handed the photo line-up to Germain and told him to look at the photographs and see if he recognized anyone. Detective Miller did not suggest to Germain which picture to select or tell him that the robber's picture was included in the lineup. Germain immediately identified Hunter, in the top middle position, as the robber he had seen fifteen days before in the convenience store. Nothing about Hunter's photograph, in contrast to the other five, led to this identification. All six males, pictured from the shoulders up, are similar in appearance and depiction in the photo spread. While there may have been only one other male who could possibly be described as "chunky," from the pictures used, Hunter does not stand out in comparison to the others in that the males in the photographs are not distinctive in build one way or the other. Further, four of the six males were wearing white shirts, although two of those males wore different shirts on top of the white shirt. The undersigned finds that none of these "distinctions" was suggestive or resulted in Germain's selection of Hunter's photograph as the person he saw fifteen-days earlier. Finally, Hunter's photograph used in the lineup accurately reflected his appearance shortly after the robbery in that it was taken just four-days later. Contrary to the petitioner's assertion, use of the booking photograph instead was not required. See Petitioner's Exhibit 16. The booking photograph is a small black-and-white photograph, which is no more accurate than the one used and certainly would not have been placed in a photographic lineup with other large and clearer color, or even black-and-white, photographs. In conclusion, there is simply nothing suggestive about the photo line-up or the manner in which it was used which suggested defendant's identification by the witness.

Even if Hunter can show the identification procedures were impermissibly suggestive, Germain's identification of Hunter as the robber was reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony." <u>Manson v. Brathwaite</u>, 432 U.S. at 114. As indicated above, there are several factors to be considered in determining whether the identification was reliable as set forth above. <u>See</u> <u>Neil v. Biggers</u>, 409 U.S. 188. When applying those factors to this cases, the photo lineup was not unduly suggestive and Germaine's out-of-court identification of Hunter was reliable under the totality of the circumstances. First, Germain saw the unobstructed face of the robber three times. <u>See</u> Trial Transcript at 34-5, 41-7. The robber first passed in front of Germain when he entered the store and quickly exited. <u>Id</u>. Germaine next saw the robber's face when the robber re-entered the store and walked directly in front of Germain. <u>Id</u>. Germaine again saw a portion of the robber's face when he approached Germain with the gun. <u>Id</u>. Germain had a clear, unobstructed view of the robber's face for ten to twenty seconds from a distance of twenty to twenty-five feet. <u>Id</u>. at 42-43, 46-47. The convenience store was equipped with overhead lighting and there was a light overhead the cash register which provided sufficient illumination for Germain to view the robber's face. <u>Id</u>. at 43.

Next, Germain's trial testimony indicates that he had a heightened degree of attention in that was working as a clerk in the convenience store and he testified that he noticed the robber immediately after he entered the store and his suspicions became aroused when he noticed that the robber had disappeared behind the shelves at the same time that the cash drawer was open as he was tending to a customer. <u>Id</u>. at 34. Germain testified at trial that from January to April 2001, there were several instances of shoplifting and that "very often when I'm waiting on a customer at

the cash register, people walk behind me and shoplift." Id. at 32,
34. Based upon this experience, Germain turned his head to look
towards the robber to see what he happening and as he did so, the
robber immediately walked towards him, pointing a gun. Id. at 34-5.
It is apparent that Germain's attention was focused on Hunter and
he continued to look at Hunter's face as he was approaching with
the gun until the robber pushed Germain to the floor. Id. at 41,
43-4. The fact that Germaine remembered details of the event, such
as the color of the shotgun and the exact words uttered by Hunter,
demonstrate that he focused on Hunter and what was happening. Id.
at 35, 55. Germain also saw the robber's face before the gun was
pointed at him, therefore, even if his attention shifted to the gun
and/or he could not focus on the perpetrator because he was in fear
for his life at some point during the incident, Id. at 41,
sufficient attention to the robber's face is present to allow for
a reliable identification.

The next factor is the accuracy of the witness' prior
description of the criminal. Germaine described the robber to
Officer Toledo as an African-American male between the ages of 18
to 21 who was 5'6" in height, weighed 200 pounds, had a dark
complexion, and a beard. See Petitioner's Exhibit 6. The victim
further told Officer Toledo that the robber had worn a black
skully, a multicolored sweater and dark pants. Id. The description
of the robber provided to Detective Miller was that he was a black
male, 21-23 years of age, 5'9" to 5'10" in height, weighed 180 to
200 pounds, was chunky, had black hair, and a full beard. See e.g.,
Petitioner's Exhibit 8. Germain also said that the robber had been
wearing a white T-shirt, jeans, a white hat, and carried a
dark-colored duffel bag. Id. At trial, Germain described the robber
as a black man, who was slightly taller than his height of 5'7",
chunky in build, and who had been growing a beard. See Trial

35

Transcript at 53-4, 62. While it is true that the physical descriptions provided by Germain are not identical as was the description of the clothing worn by the robber,[10] the differences are not material here. Germaine's descriptions closely resemble Hunter, an African-American man, who was at the time of his arrest twenty-one years old, 5'10", and 230 pounds. See Petitioners Exhibits 12, 16.

As to Germaine's certainty of his identification, the record reveals that Germain immediately and unequivocally selected Hunter's photograph during the photographic lineup conducted fifteen days after the robbery and again testified with certainty at trial that the photograph selected was the robber. See Trial Transcript at 39-40, 136-39. He also testified that the person selected from the photographic lineup was the same person in the surveillance video. Id. at 73. While Germain could not identify Hunter at trial as the robber, as noted herein, Hunter's appearance had changed drastically from the time of his arrest until the time of trial, due to his significant weight loss and change in hair length. Id. at 99, 127. Finally, the time between the robbery and the identification procedure was short, only fifteen days apart (i.e., April 26 to May 11, 2001).

While Germain could not see the robber's face for the entire incident and while Germain had provided somewhat inconsistent descriptions of the robber, under the totality of the circumstances here, the identification was reliable. See United States v. Meyer, 359 F. 3d 820, 825-826 (6 Cir. 2004)(finding armed robbery victim

---

[10]At the time of the robbery, the robber was wearing a white tee-shirt and dark hat. See Respondent's Composite Exhibit 23; Petitioner's Exhibit 3. During the trial, Germain testified that the robber had been wearing a short sleeved white tee-shirt and did not recall telling the officer that the robber had been wearing a sweater. See Trial Transcript at 62-3.

had sufficient opportunity to observe the perpetrator to overcome an arguably suggestive pretrial identification even though he could not see the perpetrators face for some portion of the incident); United States v. Hill, 967 F. 2d 226, 232 (6 Cir. 1992)(in-court identification admissible even though the witness had given an earlier inconsistent description and had only a couple of minutes to view a robber who was disguised with a cap, sunglasses, and a bandage on his nose); Smith v. Campbell, 781 F. Supp. 521, 529 (M.D. Tenn. 1991)(discrepancy between victim's description of defendant's height, age, hair color, and shape of his nose, compared to the defendant's actual appearance was insufficient to call reliability of identification into question); United States v. Crozier, 259 F. 3d 503, 512 (6 Cir. 2001)(in-court identification of robber sufficiently reliable even though witness had described the robber as sixty pounds heavier, the robbery took place over only a ten-minute period, and witness earlier had been unable to describe the robber).

The procedures leading up to the identification did not, under the totality of the circumstances, create "a very substantial likelihood" that Germaine would misidentify Hunter at the time or irreparably taint the possibility of later in-court identification. This does not mean that Hunter's identification testimony was necessarily accurate, only that it was admissible. See Rodriguez v. Young, 906 F.2d 1153, 1164 (7 Cir. 1990). Whether it was accurate as well as admissible was a question for the finder of fact. The credibility and reliability of the victim's identification of Hunter as the perpetrator was a matter for the jury.[11] See Mason v.

---

[11]The credibility and reliability of witness testimony is a question of fact to be determined by the jury. Mason v. Brathwaite, 432 U.S. 98, 116 (1977). While the testimony of these witnesses may contain questionable elements, "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Mason, 432 U.S. at 116. As credibility is a question of fact for a jury, the jury is

Brathwaite, 432 U.S. at 116. The identification here manifested sufficient indicia of reliability to warrant letting the jury decide what weight to give it.

While Germaine could not make a positive identification at trial, such fact does not alter this Court's conclusion that the pre-trial identification was admissible in Florida as substantive evidence of identity. The Florida Supreme Court has held that an identification made shortly after the crime is inherently more reliable than a later identification in court. State v. Freber, 366 So.2d 426, 428 (Fla. 1978)(stating that the fact that the witness could identify the defendant when the incident was still so fresh in her mind is of obvious probative value). As aptly noted by the Florida Supreme Court:

> It is certainly not unusual for the appearance of a defendant to change in some way between his apprehension and trial. A holding not allowing this sort of testimony as substantive evidence of identity would encourage defendants to change their appearance before trial to avoid being identified in court. Without this proof that the person previously identified by the witness was the defendant, conviction would in some instances be impossible.

Id. As indicated above, Hunter's appearance changed dramatically from the time of the pre-trial identification until the time of trial.

Since there was no substantial likelihood of misidentification, and the victim's pretrial identification was unequivocal, any motion to suppress would not have been successful. Further, there was no constitutional error in admitting Germaine's testimony, because the evidence in the case as a whole, while not overwhelming, was sufficient to support a conviction. Consequently,

---

"exclusively responsible for determining a witness' credibility." United States v. Strauss, 999 F.2d 692, 696 (2 Cir. 1993).

even if counsel's performance could in any way be viewed as deficient, Hunter was not prejudiced. See Strickland, supra. See also Knowles v. Mirzayance, ____ U.S. ___, ____, 129 S.Ct. 1411 at 1422. The mere fact that there was "nothing to lose" by pursuing a defense does not, by itself, mean that counsel's performance was deficient. As the Supreme Court has recently observed, it has never found counsel to be deficient simply because he "abandon[ed] [a defense] [when] there was nothing to lose by pursuing it." Knowles, 129 S.Ct. at 1419 & n. 3.

(E) Ineffectiveness Regarding Cross-Examination of Germain

Hunter claims that trial counsel failed to adequately cross-examine Germain as to the issue of identity during the deposition and at trial. Review of the transcript of the deposition reveals that trial counsel did question Germain about photographs viewed by Germain although he did not extensively pursue the issue and did not ask specific questions to determine if any pictures were shown before the photographic lineup, as he possibly should have. See Transcript of Germain deposition at 10-11, 29-30. For the reasons indicated above, however, even if he had done so, a motion to suppress would not have been successful based upon the record now before this Court. Trial counsel, therefore, did not render constitutionally ineffective assistance of counsel. See Strickland, supra.

At trial, trial counsel did not specifically cross-examine Germain as to whether he was shown a photograph of Hunter wearing or with a backpack before the photographic lineup. See Trial Transcript at 57-64, 67-8. However, contrary to the assertion of the petitioner, defense counsel, during cross-examination of the state witnesses at trial and by way of forceful argument to the jury, vigorously challenged the identification obtained by the

39

police, attempting to convince the jury that the victim had misidentified Hunter. During argument before the jury, the defense focused on the victim's inability to make an in-court identification and the lack of physical evidence,[12] arguing that the state had failed to establish beyond a reasonable doubt that Hunter was in fact the robber. See Trial Transcript at 58-64, 142-150, 153-169, 503-518, 538-549. In attacking the identification evidence, trial counsel pointed out that Germaine had only twenty seconds to view the face of the robber and during such time he was "under circumstances of terror" in that a gun was pointed at his face; that Germain was unable to clearly see the perpetrator and accurately identify him, that Germain gave inconsistent descriptions of the perpetrator;[13] that there was a lack of

---

[12]Trial counsel stated as follows during the closing argument:

> [W]e have absolute proof that Lucius [sic] Germain is an honest man because he came into this court, sat in that witness stand and swore to tell the truth, and he said that the man that did this is not in the courtroom after having had pretrial meetings with the prosecutor and Detective Miller; after all of that, knowing that he could have walked in that door and knowing that he was going to be testifying in a case involving a man that the State said did it, he still stood up before you, looked around, looked at Mr. Hunter in the face and said, I do not see the man that did this to me. He looked at Mr. Hunter in the face and didn't even see a resemblance, no similarity. Why? Because Mr. Hunter did not do this crime. After an hour on the stand and efforts on behalf of the State to elicit an identification, he looked at Mr. Hunter and did not see the man that did this. He is the only eyewitness in this case that you've heard from, the only one to testify. If it doesn't satisfy the only eyewitness, it can't satisfy you either....

(Trial Transcript at 503-04).

[13]For example, trial counsel cross-examined the victim as follows:

> Q.   Do you recall the exact description that you gave to the police officer of the perpetrator?
>
> A.   Maybe I forgot part of the description, but I believe I still recall the information that I gave them.
>
> Q.   When you were giving the description to the officer, was he writing it down?
>
> A.   I don't recall, but I'm not a hundred percent sure, but I believe the officer was writing down something.
>
> Q.   Do you recall telling the officer that the perpetrator was

corroboration of Germaine's identification with other witnesses or physical evidence, such as fingerprints; and that there was no conclusive identification of the gun and the backpack.[14] Id.

Regarding the defense presented at trial, former trial counsel Kaminsky testified at the evidentiary hearing as follows:

---

approximately 5-foot six?

A.    No. I recall saying to the officer that the man is a little bit taller than I am.

Q.    Do you recall telling the officer the perpetrator was wearing a multi-colored sweater?

A.    Sweater?

Q.    Yes.

A.    I don't recall. What I recall is that the thief was wearing a white T-shirt, short sleeve.

Q.    Now, you also spoke to a detective; is that correct?

A.    Yes.

Q.    And that was also on the same day of the incident?

A.    I don't recall if it was the same day.

Q.    You spoke to more than one police officer on the day of the incident?

A.    I don't recall if I spoke to more than one officer.

(Trial Transcript at 62-63).

[14]The following remarks made during closing argument is illustrative of the defense presented:

So let's ignore the fact of the initial description. Let's ignore the fact that the only eyewitness to this crime told us that this person has a full beard. Let's ignore the fact that Mr. Hunter doesn't have a full beard. Let's ignore the fact that we have no fingerprints. Let's ignore the fact that he only had 20 seconds to view this perpetrator. Let's forget about the fact that the ID occurred in a photograph two weeks later. Let's ignore the fact that in that 15 days between the date of the incident and the identification, Mr. Germain was at work every single day from dusk till dawn at that store every singe day. Let's ignore the fact that he may have seen one thousand or more faces in that 15 days before he made that ID. Let's just ignore that. Who cares?  Who cares if there is another eyewitness out there who didn't have a gun in their face? Who cares if there is another eyewitness out there who may be able to corroborate the victim? Who cares? They didn't care....

(Trial Transcript at 514-15).

> We -- well, first of all, we had a client sitting at our
> table who looked nothing like the person -- I thought, looked
> nothing like the person in the photo array that the victim had
> identified. And additionally, didn't look anything like the
> person that was in the video.
>
> Whether the person in the photo array was or wasn't Mr. Hunter
> -- and obviously, it was -- really didn't matter to us. We, we
> saw this as, you know, a basis for reasonable doubt in the
> trial.

See Transcript of Evidentiary Hearing at 46. During the state's examination of Germain, Hunter unexpectedly received highly favorable testimony when Germain could not make an in-court identification. Id. at 36. The defense here could not have asked for more from the victim. Trial counsel already had, through Germain's direct testimony, that which most defendants hope to get through cross-examination-an admission that Germain could not make an in-court identification. To cross-examine Germain differently and/or more extensively could have provided the state with an opportunity to rehabilitate that testimony which was favorable for the defense and/or again present testimony that Germain's out-of-court identification of Hunter made just days after the robbery was strong and unequivocal. Thus, rather than do so, trial counsel elected to instead challenge the identification by way of a relatively brief cross-examination, pointing out various inconsistencies in the descriptions of the perpetrator given by the victim, and vigorous closing argument.[15]

Further, as trial counsel testified during the evidentiary hearing, the defense vigorously sought the suppression of the gun

---

[15]While trial counsel did not expressly testify at the federal evidentiary hearing that additional cross-examination of Germain was not conducted due to the unexpected direct testimony, trial counsel Sayfie started her cross-examination of Germain by stating, "I'll try to keep this short because you have already covered a lot of what I needed to cover." See Trial Transcript at 57. Thus, the record supports such a finding, albeit implicitly.

and backpack, and filed a motion to suppress and motion in limine with regard to those items, believing that the unusual gun and backpack were the key pieces of evidence that linked Hunter to the subject armed robbery. See Transcript of Evidentiary Hearing at 43-4. Extensive pretrial evidentiary proceedings were conducted on the motions. See Transcript of Pretrial Motions conducted on July 15, 2002, at 4-175. Although, the motions were for the most part unsuccessful, the defense attempted to minimize the impact of that evidence at trial. Accordingly, the manner in which trial counsel conducted cross-examination of Germaine was clearly reasonable trial strategy under the circumstances of this case, not amounting to deficient performance.[16] See Strickland, supra. See also Julien v. Hendricks, 2005 WL 2290287 (D.N.J. 2005)(holding that counsel's performance at trial was not deficient pursuant to the Strickland standard when he failed to cross-examine an eyewitness on an out-of-court identification where the witness could not make an in-court identification).

Finally, even if trial counsel's performance could be deemed deficient for all or any of the reasons alleged, Hunter cannot satisfy the prejudice-prong of Strickland. In light of counsel's thorough cross-examination of the state witnesses, as well as strong closing argument, which emphasized the various inconsistencies in the case and lack of physical evidence, Hunter has not shown that the outcome of the trial would have been different if counsel had cross-examined any of the witnesses differently, including the victim, or pointed out any additional

---

[16]Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strickland v. Washington, 466 U.S. 668, 690-91 (1984). Even if in retrospect the strategy to pursue one line of defense over another appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it. Adams v. Wainwright, 709 F.2d 1443, 1145 (11 Cir. 1983),

inconsistencies.  See Simmons v. United States, 390 U.S. 377, 384
(1968)("The danger that use of the [pretrial identification]
technique may result in convictions based on misidentification may
be substantially lessened by a course of cross-examination at trial
which exposes to the jury the method's potential for error.").
Further, there was more than sufficient evidence, albeit a large
part of the evidence consisting of circumstantial evidence, that
Hunter was the perpetrator of the subject armed robbery. Here,
Germaine testified that the person he identified in the
photographic lineup was the same person seen on the surveillance
videotape recording, the person on the surveillance video resembled
Hunter, and the shotgun and backpack that Hunter had in his
possession were similar to the shotgun and backpack used by the
perpetrator.

VIII. <u>Conclusion</u>

Following review of the evidentiary record, which includes the
transcript of evidentiary proceedings before the undersigned,
together with the parties' multiple post-hearing briefs, it is
again recommended that this petition for habeas corpus relief be
denied.[17] 28 U.S.C. §2254(d)(1); <u>Williams v. Taylor</u>, <u>supra</u>.

Objections to this report may be filed with the District
Judge within fourteen days of receipt of a copy of the report.

_____

[17]It is noted that the petitioner has now made various new assertions,
including that Bodie, the suspect arrested along with Hunter for committing
unrelated cargo thefts, was the perpetrator of the instant robbery; that original
photographs were cut and then placed on a single sheet and photocopied together;
etc. This Court will not specifically address these new assertions in that they
stray from the issue on remand and the conclusion that Hunter was not deprived
of constitutionally effective assistance of counsel stands.

Signed this 25th day of May, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Janice L. Bergmann, AFPD
     Federal Public Defender
     SouthTrust Tower
     One East Broward Boulevard
     Suite 1100
     Ft. Lauderdale, FL 33301

     Anthony J. Natale, AFPD
     Federal Public Defender
     150 West Flagler Street
     Suite 1500
     Miami, FL 33130

     Samuel Randall, AFPD
     Federal Public Defender
     150 West Flagler Street
     Suite 1500
     Miami, FL 33130

     Forrest L. Andrews, Jr., AAG
     Department of Legal Affairs
     444 Brickell Avenue
     Suite 650
     Miami, FL 33131

     Lunar C. Alvey, AAG
     Department of Legal Affairs
     444 Brickell Avenue
     Suite 650
     Miami, FL 33131